**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA        ) | |
| ) | |
| v.                    ) | **Hon. Thomas J. McAvoy** |
| ) | **Senior U.S. District Court Judge** |
| ROBERT TWISS                ) | **Case No. 17-CR-059-001** |
| ) | |

## SENTENCING MEMORANDUM

Upon Robert Twiss's waiver of indictment and plea of guilty to the single-count information charging possession of a firearm by a prohibited person in violation of 18 U.S.C. §922(g)(1), Mr. Twiss asks the Court to impose a sentence of time served with a period of supervised release. The applicable sentencing guideline range in this case, which falls within Zone C of the Sentencing Table, allows for a non-custodial sentence. The sentence requested here would be a guidelines sentence.

In addition to the sentencing guidelines, Mr. Twiss's history and characteristics and the nature and circumstances of the offense support a non-custodial sentence, particularly in light of the 5 months in detention already served by Mr. Twiss. The firearm possession case against Mr. Twiss involved his possession of a rifle in and around his rural Greene County home, not any problematic use of that firearm. His possession of the firearm was illegal due to a 36-year-old felony conviction. Although he was granted a certificate of relief from disabilities following that conviction which he was aware did not fully restore his right to possess firearms, language in that certificate caused him to believe that possession of a firearm was not as serious a transgression as it has turned out to be. Mr. Twiss's most recent prior involvement with the criminal justice system was 16 years prior to this case, so he has no scoreable criminal history under the sentencing guidelines.

Mr. Twiss has exhibited extraordinary acceptance of responsibility. From the moment of his

arrest forward, Mr. Twiss was cooperative with the law enforcement investigation of him. Without reservation, he declined to pursue any action through which he otherwise could have challenged the government's ability formally to prosecute him or to present evidence against him at a trial. He freely and willingly admitted his conduct and pleaded guilty, preventing the expenditure of further government resources.

Considering the foregoing and Mr. Twiss's full compliance with terms and conditions of post-plea supervision, a sentence of time served with supervised release, <u>which would be a guideline sentence</u>, would be sufficient to serve the purposes of sentencing.

## I.    OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT

Mr. Twiss does not object to the sentencing guidelines computation in the PSR, which finds the total offense level to be 12, the criminal history category to be I (due to zero criminal history points), for a guideline range of imprisonment of 10 to 16 months. That range is within Zone C of the sentencing table.

Mr. Twiss informed the U.S. Probation Office of objections/clarifications to the factual contents in the PSR, consisting of the following, which have been noted in the Second Addendum to the PSR (dated August 2, 2017):

> Paragraphs 5 through 15: These paragraphs appear to include accurate summaries of law enforcement reporting; however, to the extent the reporting asserts that law enforcement suspected Mr. Twiss "had plans to engage in acts of violence" (para. 7), and to the extent reported information was limited to details colored by that suspicion, Mr. Twiss asserts that law enforcement authorities were incorrect that he had any such plans or that he had any intention to form such plans.

> Para. 30: Mr. Twiss seeks to clarify that whatever particular political "movements" pledge or stand for, his own political views do not include espousing resistance against the government.

## II.   THE COURT SHOULD IMPOSE A SENTENCE OF TIME SERVED WITH SUPERVISED RELEASE IN LIGHT THE SENTENCING GUIDELINES AND IN LIGHT OF ALL OF THE FACTORS UNDER 18 U.S.C. §3553(a).

### A.   History and Characteristics of Robert Twiss.

Robert Twiss, who is 59 years old, has reached this point in his life having endured a great deal of hardship, which he largely has overcome. After a life of hard knocks—some self-inflicted—he is a mature, inquisitive and industrious individual whose objective is to be self-sufficient. In this case, he expressed himself in blustery ways that brought him negative attention which he certainly regrets. He seeks little more than to provide for himself, maintain his home and live in peace.

Robert's upbringing was extraordinarily hard. Although he was born to married parents, his father was mostly absent, regularly abandoning the family for extended periods of time. Robert's mother was forced to raise Robert and his seven younger siblings on her own. She was ill-equipped financially, emotionally and psychologically to do so, with extraordinarily damaging consequences. When Robert was seven, his mother suffered a nervous breakdown and had to be hospitalized. Robert and his siblings were placed in separate foster homes. They would toil in the foster care system for the next five years, some of the most important formative years of young Robert's life. When he was 12 years old, Robert and his brother Michael (who was 10 years old and by then had been placed in the same foster home as Robert) ran away from their foster home in Poughkeepsie.

They searched for their mother and found her in Troy. Although ultimately they were legally returned to the custody of their mother, the conditions in which Robert and his siblings existed at home were hardly nurturing. When Robert's father was around, as infrequently as he was, he was physically and verbally abusive.

Considering the extraordinary instability of Robert's upbringing, whether in the foster care

system or when he resided with his mother, and the complete absence of adequate parental guidance and supervision, it is unsurprising that Robert dropped out of school in his early teens. It is unsurprising that his initial contacts with the criminal justice system were during those teenage years. It is unsurprising that he had multiple contacts with the criminal justice system thereafter.

The bulk of his contacts with the criminal justice system occurred in his teens and into his 20s. Prior to the instant case, the part of Robert's life when he faced criminal justice problems was in the distant past. His last conviction of any kind occurred 16 years ago. His sole prior felony conviction (non-residential burglary), happened nearly 37 years ago when he was 22 years old. Close scrutiny of Robert's life and criminal history reveals that he had put his legal difficulties well behind him. He had moved on to be mature, responsible and focused on what is important to him.

At this point in his life, Robert seeks to be as settled and stable as possible. He has been involved in a committed relationship with Debra Kryskowski for the past 8 years. They live together in Mr. Twiss's home. The two still seek to be married. (They intended to have the marriage ceremony after Mr. Twiss was released in March, but life's complications—Robert's initial difficulty finding employment, and Debra's recent medical issues—have conspired against that.) Debra has been gainfully employed for most of their time together, and she has no criminal history or any issues with alcohol or substance abuse. Robert has provided a separate trailer on his property for Debra's adult daughter to live in.

Debra's physical health has been deteriorating recently despite her relatively young age (45 years). She has suffered through unexplained heart issues in recent months and has undergone myriad diagnostic procedures. She recently was diagnosed with degenerative vascular disease in her lower extremities. She is happy to have Robert by her side as she deals with her new medical developments.

4

For decades, Robert has been consistently and stably employed.  Prior to his arrest in this case, he had been employed at Home Depot in the tool rental department for the past two years. For the 10 years before that, he was a self-employed general contractor, with fluctuating but sufficient earnings over that time.  Before that, he worked for others in the building and carpentry trades and for years at a time at other manufacturing or construction jobs.

Aside from working hard, Robert spends time learning how things work and envisioning and researching inventions that can improve his self-sufficiency.

### B.  *Nature and Circumstances of the Offense.*

This case stemmed from an investigation which initially viewed Mr. Twiss to be different than he really is.  The investigation was launched based upon a suspicion that Mr. Twiss "had plans to engage in acts of violence" as part of some militia.  See, Criminal Complaint, ECF Docket No. 1.  After more than a full year of consensual surreptitious recording of Mr. Twiss, mostly at backyard gatherings at his home in the presence of a small number of other individuals, and after the search of Mr. Twiss's premises, it appears that the government's complete investigation—and the defense's review of the information underlying that investigation—reveals that Mr. Twiss is a bit of a blow hard about what he thinks he knows and what he thinks he can invent.  That investigation appears to have revealed the absence of evidence of plans on Mr. Twiss's part to engage in illegal activities.  The law enforcement search of Mr. Twiss's premises uncovered no significant evidence of any criminality or planning of crimes, aside from evidence that Mr. Twiss possessed a rifle at his rural home while being a prohibited person.

Much of the government's evidence arising from its months-long investigation and hours of surreptitious recordings of small, backyard gatherings reflects that Mr. Twiss appeared to enjoy bragging and blustering in front of other people outdoors, near his barbeque grill, and

talking to those people about his views that others would be wise to prepare for the decline of civilization or the dissolution of the U.S. government.  The government's cooperator appears to have gone to Mr. Twiss's home on multiple occasions.  The gatherings apparently never involved more people than can be counted on one hand.

Discussions in which fantastic statements are attributed to Mr. Twiss included his explanations about preparing for scenarios involving the take-over of the government by other tyrannical forces, not his own actions against the government.  Such discussions also include statements attributed to Mr. Twiss, perceived objectively as bragging to a large extent, in which he professes to have broad knowledge of how to invent things, including defenses, including a "gasifier" which would enable him to create his own home-made fuels in the event typical fuels would no longer be commercially available, to be able to survive in the event the government fails, the electrical grid fails, and marauders roam the countryside.  As the PSR notes in ¶9, Mr. Twiss was particularly enthralled by the image of an "Armageddon"-like scenario, and that is the imagined scenario underpinning all of the pictures he painted of having to resort to particular measures to survive the extreme unraveling of civilization.  The statements attributed to him suggest a survivalist mindset. The information developed did not establish planning of overt acts of violence, contrary to the suspicions apparently prompting the government's investigation.

When Mr. Twiss was arrested, and immediately following his apprehension by police, he was interviewed by FBI agents.  The interest of federal law enforcement authorities made clear to him the seriousness of the case.  He nevertheless voluntarily waived his Miranda rights, knowing fully what the consequences might be of his willingness to be forthright with those law enforcement officers.

Entirely consistent with that early cooperativeness, Mr. Twiss was fully cooperative in the resolution of the state and federal prosecutions against him (both of which arose from the

possession of the same exact firearm).  Knowing that he had the constitutional right to be charged by a grand jury indictment, he nevertheless voluntarily waived that right and consented to be prosecuted by the government's information.  Fully aware of his rights to raise challenges to the seizure of evidence during a search of his premises and to statements elicited from him by law enforcement agents and to exercise his right to a trial, he nevertheless voluntarily waived all of those rights.  He was fully intent on pleading guilty and, without reservation, accepting responsibility for his actions from the earliest possible time, and he followed through on that intention, obviating (to the extent he had the power to do so) the expenditure of federal and state resources in the dispositions of the parallel cases against him.  (In addition to this federal case, Mr. Twiss was charged in Greene County Court with a New York state law felony relating to the same firearm at issue in this case.  Consistent with his intention to fully accept responsibility in the federal case, Mr. Twiss pleaded guilty in state court.  Because of that, he has incurred multiple felony convictions in two different jurisdictions for the possession of the same rifle.)

It should be noted that in and around Earlton, New York, it is likely that the majority of people, or at least a significant part of the population, possesses shotguns and/or rifles.  In rural areas of upstate New York, it simply is a fact of life that people have guns, whether for target shooting, hunting or managing vermin around the home.  There is no indication Mr. Twiss's possession of a rifle was for any different reason than firearm possession of most people in his community.

Mr. Twiss understood that his prior felony conviction would prohibit him from possessing certain firearms legally, particularly since the Certificate of Relief from Disabilities issued after his felony conviction did not fully restore his rights.  See, Exhibit A, Certificate of Relief from Disabilities.  He understood from that document, though, that he might face a misdemeanor case in state court if he possessed an illegal firearm because that Certificate of Relief from Disabilities specifically exempted from relief the disability arising under New York Penal Law §265.01(4)

(criminal possession of a weapon in the 4th degree), which makes it a misdemeanor for a person with a prior felony to possess, among other things, a rifle.  Although criminal possession under any circumstances is problematic, Mr. Twiss did not fully appreciate how serious his possession of that rifle would be considered by federal authorities.

Mr. Twiss's firearm possession in this case involved the possession of the rifle at his rural home.  He did not use it for any illegal purpose.  He had no intention to use it illegally.  In fact, while referring to that gun during blustery, recorded conversations, he also commented in a way suggesting that he had no particular affinity for it or for keeping it.  At the last recorded meeting with the cooperator on September 9, 2016 when the cooperator asked to come over to shoot the rifle, Mr. Twiss can be heard talking about how his girlfriend hates guns and saying, "I'm gonna probably get rid of this stupid gun anyway."  See, Exhibit B, excerpt from transcript of September 9, 2016 meeting[1].

### C. Robert Twiss's Performance on Supervision.

The Court released Mr. Twiss on March 20, 2017 after his waiver of indictment/plea to the information.  Over the six months since release Mr. Twiss has been fully compliant with his conditions of presentence supervision.

As the Court is aware, one of Mr. Twiss's intentions while on release was to repair damage to his home caused by a fire during his pretrial detention.  Because he had lost his job at Home Depot as a result of his arrest and 5 months in pretrial detention, he had difficulty finding a source of income post-release.  After a nearly three-month struggle, Mr. Twiss obtained employment in mid-June performing carpentry and maintenance at a resort/camp in the Catskills.  He was employed full-time there through the rest of the summer.  Even though their summer camp season

---

[1] Although the speaker is identified by the transcriber as "UM", defense counsel's recollection of the review of the video recording of the same 9/9/16 meeting is that the person who uttered the statement about getting rid of the gun is Mr. Twiss, not an unidentified male.

has ended and the camp is closed, they have kept Mr. Twiss on to perform carpentry and maintenance work.  He continues to work there now.  The income from that employment has enabled him to perform the bulk of the needed repairs to his home.

While on supervision, Mr. Twiss has reported as required.  He has submitted to drug testing, and he has tested negative for controlled substances every time.  Robert has demonstrated while on presentence supervision that he can be and will be a law-abiding individual and would comply with conditions of supervision should a supervisory sentence be imposed.

### D.      The kinds of sentences available, the sentencing guidelines and policy statements, and purposes of sentencing to be served.

### 1.      A sentence of time served would be a guideline sentence.

Mr. Twiss's background, his true conduct underlying the charge in this case, and his actions since his arrest and presentence release support a sentence of time served with supervised release, considering that he has served one-half the minimum term of the 10 to 16 month range.  Such a sentence is available to the Court under the sentencing guidelines for a guideline range within Zone C.

The guidelines provide:

(d)      If the applicable guideline range is in Zone C of the Sentencing Table, the minimum term may be satisfied by --

(1)      a sentence of imprisonment; or

(2)      a sentence of imprisonment that includes a term of supervised release with a condition that substitutes community confinement or home detention according to the schedule in subsection (e), provided that at least one-half of the minimum term is satisfied by imprisonment.

(e)      Schedule of Substitute Punishments:

(1)      One day of intermittent confinement in prison or jail for one day of imprisonment (each 24 hours of confinement is credited as one day of intermittent confinement, provided, however, that one day shall be credited for any calendar day

during which the defendant is employed in the community and confined during all remaining hours);

(2)      One day of community confinement (residence in a community treatment center, halfway house, or similar residential facility) for one day of imprisonment;

(3)      One day of home detention for one day of imprisonment.

U.S.S.G. §5C1.1(d) and (e).

Considering Mr. Twiss's performance on presentence supervision, reflecting that he respects the law and that he needs no further imprisonment to be deterred from further criminal conduct, time served with supervised release would be appropriate.

The Supreme Court in <u>Gall</u>, in addressing the appropriateness of a probation sentence for a member of a serious drug distribution conspiracy, analyzed the serious nature of probation sentences:

> We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms.  Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty.  <u>See, United States v. Knights</u>, 534 U.S. 112, 119, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001) ("Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled'" (quoting Griffin v. Wisconsin, 483 U.S. 868, 874, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987))).[FN4]  Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court.  They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking.  USSG § 5B1.3.  Most probationers are also subject to individual "special conditions" imposed by the court.  Gall, for instance, may not patronize any establishment that derives more than 50% of its revenue from the sale of alcohol, and must submit to random drug tests as directed by his probation officer. App. 109.

> FN4. See also Advisory Council of Judges of National Council on Crime and Delinquency, Guides for Sentencing 13-14 (1957) ("Probation is not granted out of a spirit of leniency .... As the Wickersham Commission said, probation is not merely 'letting an offender off easily' "); 1 N. Cohen, The Law of Probation and Parole § 7:9 (2d ed. 1999) ("[T]he probation or parole conditions imposed on an individual can have a significant impact on both that person and society .... Often these conditions comprehensively regulate significant facets of their day-to-day lives .... They may become subject to frequent searches by government officials, as well as to mandatory counseling sessions with a caseworker or psychotherapist").

Gall v. United States, 552 U.S. 38, 48-49, 129 S. Ct. 586, 595-596 (2007).

Specifically responding to the government's concerns in Gall that probation would not promote respect for the law, the Supreme Court agreed with the district court's conclusion that "in Gall's case, 'a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing.'" Id. at 54.

A sentence of time served with supervised release here would not be a lenient sentence. It would carry with it a definitive and just punishment. Mr. Twiss requires no more severe punishment to have respect for the law or to be deterred from committing similar crimes in the future. By his post-arrest, post-release actions, the Court can be assured that he understands the seriousness of his transgressions, respects the law that he has broken and is unlikely to engage in similar conduct again. The community clearly is not in need of his incapacitation to be protected from him. He simply is no danger.

Based upon all of those factors, the Court should impose a sentence of time served with supervised release.

**CONCLUSION**

Taking into consideration all of the factors and considerations under 18 U.S.C. §3553(a), including the sentencing guidelines, Mr. Twiss respectfully requests that the Court impose a sentence of time served with supervised release.

Date: September 20, 2017                      LISA PEEBLES
                                              Federal Public Defender


                              By:    /s/Timothy E. Austin
                                     Timothy E. Austin
                                     Assistant Federal Public Defender
                                     Bar Roll No. 508098
                                     39 North Pearl Street

Albany, New York 12207
Tel:  (518) 436-1850
Fax: (518) 436-1780
Email:  tim_austin@fd.org

To:     United States District Court Clerk
        Richard Belliss, AUSA
        Melyssa Inman, USPO

## CERTIFICATE OF SERVICE

I, Timothy E. Austin, Esq., hereby certify that on September 20, 2017, I filed the foregoing Sentencing Memorandum with exhibits by CM/ECF, and automatic notification of the filing of the same was provided to

AUSA Richard Belliss

and I served the same upon USPO Melyssa Inman by email.

LISA PEEBLES
Federal Public Defender


By:     */s/Timothy E. Austin*
        Timothy E. Austin
        Assistant Federal Public Defender
        Bar Roll No. 508098
        39 North Pearl Street
        Albany, New York 12207
        Tel:  (518) 436-1850
        Fax: (518) 436-1780
        Email:  tim_austin@fd.org